UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. DAVID HUMP, and KAREN HUMP, Individually, and d/b/a BEAR COAT BISON, f/k/a Bear Coat Bison LLC, Defendants. | 3:19-CV-03020-RAL OPINION AND ORDER ON MOTION FOR SUMMARY JUDGMENT |

The United States brought a lawsuit against David and Karen Hump (collectively "the Humps") seeking to foreclose on Indian trust land located within the Cheyenne River Sioux Indian Reservation. Doc. 1. The United States filed a motion for summary judgment, Doc. 6, which the Humps oppose, Doc. 19.[1] For the reasons explained herein, this Court now grants the United States' motion for summary judgment.

I. **Background**

   A. **Indian Loan and Guarantee Insurance Program**

---

[1] The Humps' response to the United States' motion for summary judgment was due on November 19, 2020. After the deadline had passed, the Humps filed their response to Plaintiff's statement of material facts as well as the affidavit of David Hump, but neglected to file their memorandum in opposition to the motion for summary judgment. Docs. 15, 16. The Humps' counsel then contacted this Court, seeking an extension until December 7, 2020 to file their memorandum. This Court approved the extension, and the Humps filed their memorandum, Doc. 19, by December 7. Therefore, this Court will not disregard the memorandum as untimely.

1

In 1974, Congress authorized the creation of the Indian Loan Guarantee and Insurance Program (ILGP). 25 U.S.C. § 1481. Under the ILGP, the Secretary of Interior may guarantee up to 90 percent of the unpaid principal and interest due on loans made by lenders to qualified Indian[2] borrowers. 25 U.S.C. § 1481. By reducing the risks normally associated with lending in Indian country[3], the program is meant to encourage lenders to offer conventional financing to Indian tribes and individuals. 25 C.F.R. § 103.2. The effect is that qualified Native borrowers obtain reasonable interest rates that would otherwise be unavailable to them. Id.

When an Indian borrower defaults on a loan guaranteed under the ILGP, the lender can submit a claim for loss to the Department of Interior (DOI). 25 C.F.R. §§ 103.36(d)(1), 103.37(a). Assuming the DOI accepts the lender's claim for the loss, the DOI will pay the lender the guaranteed portion of the loan. 25 C.F.R. § 103.37(e). The lender then must assign to the DOI its rights under the loan agreement, and the DOI is immediately subrogated to all rights of the lender under the loan agreement and can pursue collection efforts against the borrower. 25 U.S.C. § 1492; 25 C.F.R. § 103.38.

## B. Undisputed Facts[4]

---

[2] The statute uses the word "Indian." The word "Indian" stems from the mistaken belief of early Europeans that they had encountered people of the East Indies when landing ships on islands off the coasts of North and South America, two continents that had a population the rough equivalent of Europe at the time and many different groups of people more properly called Native Americans. This Opinion and Order uses the word "Indian" nevertheless as that word is used in the statute.

[3] Much of Indian country is held in trust by the federal government for the benefit of Indian tribes or individuals. Because of this unique trust relationship, such land cannot be alienated or encumbered in any way without the federal government's approval. Thus, many lenders are reluctant to make loans to those who live on reservations in part because such borrowers often lack a source of collateral. See generally Cmty. Dev. Fin. Inst. Fund, U.S. Dep't of Treasury, The Report of the Native American Lending Study (2001), https://perma.cc/HXJ4-4FB5.

[4] This Court takes the facts primarily from those portions of the United States' Statement of Undisputed Material Facts not being disputed by the Humps, with one caveat. This Court considers a fact undisputed where the Humps did not cite to the record to support their objection to the fact and the fact is otherwise established in the record. Local Rule 56.1(B) requires a party opposing

2

Since 1994, the Humps have been loan customers of the Farmers State Bank of Faith, South Dakota (the Bank). Doc. 7 at ¶ 1; Doc. 15 at ¶ 1. By January 2004, the Humps applied for additional loan funds from the Bank so that they could acquire interests in Indian trust land. Doc. 7 at ¶ 2; Doc. 15 at ¶ 2. The Bank sought loan guarantees from the DOI under the ILGP, and the DOI issued loan guarantees on February 4, 2004. Doc. 7 at ¶ 4; Doc. 15 at ¶ 4. Shortly thereafter, the Bank consolidated the Humps' earlier notes and closed on three loans with the Humps. Doc. 7 at ¶ 5; Doc. 15 at ¶ 5. The Humps signed promissory notes and security agreements covering their livestock, machinery, and equipment, and the notes were cross-collateralized. Doc. 7 at ¶ 5; Doc. 15 at ¶ 5.

In October 2005, the Humps filed a Chapter 12 bankruptcy petition. Doc. 7 at ¶ 7; Doc. 8 at ¶ 5; Doc. 15 at ¶ 7. As required by regulation, the Bank submitted a claim of loss for $1,411,362.25 to the DOI.[5] Doc. 7 at ¶ 8. In January 2007, the DOI paid the Bank's claim, and the Bank assigned their three loans to the United States. Doc. 7 at ¶ 9; Doc. 15 at ¶ 9. As of September

---

a motion for summary judgment to "respond to each numbered paragraph in the moving party's statement of material facts with a separately numbered response and appropriate citations to the record." D.S.D. Civ. LR 56.1(B); see also Fed. R. Civ. P. 56(e)(2) (allowing the court to consider a fact undisputed when a party "fails to properly address another party's assertion of fact as required by Rule 56(c)"). "A failure to cite to the record when disputing a fact may result in the fact being deemed admitted." Danielson v. Huether, 4:18-CV-04039-RAL, 2021 WL 217706, at *7 (D.S.D. Jan. 21, 2021) (citation omitted).

[5] The Humps object that the claimed amount of $1,411,362.45 is inadmissible hearsay. Doc. 15 at ¶ 8. However, the Humps have admitted that this figure is correct in their answer, Doc. 3 at ¶ 11, and indeed the United States cites to the Humps' answer in support of this factual contention, Doc. 7 at ¶ 8. See Knudsen v. United States, 254 F.3d 747, 752 (8th Cir. 2001) ("A party is bound by what it states in its pleading . . . . Although the rule smacks of legalism, judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible.") (cleaned up and citation omitted)). Missouri Hous. Dev. Comm'n v. Brice, 919 F.2d 1306, 1314 (8th Cir. 1990) (holding that the defendant's admissions in his answer were binding despite evidence to the contrary of those admissions).

4, 2007, the total due to the DOI from the Humps on all three loans combined was $1,513,324.45. Doc. 8-1 at 5.

The Humps' Chapter 12 Plan of Reorganization was confirmed on September 25, 2007. Doc. 7 at ¶ 10; Doc. 15 at ¶ 10. Under the plan, the Humps agreed to pay the United States $1 million. Doc. 7 at ¶ 11; Doc. 8 at ¶ 7; Doc. 15 at ¶ 11. To memorialize the terms of the plan, the DOI refinanced $1 million of the Humps' unpaid debt with a new loan. Doc. 8 at ¶ 8. The Humps executed and delivered a promissory note in favor of the United States. Doc. 7 at ¶ 11; Doc. 8 at ¶ 9; Doc. 15 at ¶ 11. Under the 2008 promissory note, the Humps were to pay the Bureau of Indian Affairs (BIA) of the DOI the principal amount of $1 million plus interest. Doc. 1-1; Doc. 7 at ¶ 11; Doc. 15 at ¶ 11. Specifically, the Humps were to repay the loan over 27 years, with six percent interest per annum on $874,250, plus an additional balloon payment of $125,750 (without interest accrual) to be paid on September 1, 2034. Doc. 1-1; Doc. 7 at ¶ 11; Doc. 15 at ¶ 11. The promissory note allowed for acceleration of the entire debt in the event of default. Doc. 1-1 at 1; Doc. 7 at ¶ 19; Doc. 15 at ¶ 19. The Humps also executed and delivered a real estate mortgage to 1,740.67 acres of Indian trust land in Ziebach County to the United States as security for the new loan. Doc. 1-4; Doc. 7 at ¶¶ 12–13; Doc. 15 at ¶¶ 12-13.

The remaining debt, $450,642.69, was unsecured. Doc. 8-1; Doc. 8-2; Doc. 8 at ¶ 13. Because the Humps' 2008 promissory note and mortgage replaced the original three loans assigned by the Bank, the Secretary of the Interior decided to cancel the unsecured portion of the three loans assigned by the Bank pursuant to his authority under the Indian Financing Act. Doc. 8-1; Doc. 8 at ¶ 13. As required by Internal Revenue Service (IRS) regulation, the Humps received IRS Form 1099-Cs totaling $450,642.69 in 2018. Doc. 8-2; Doc. 8 at ¶ 13; Doc. 16-1 at 3–5.

The Humps defaulted on the 2008 promissory note; their last partial payment on the debt was made on December 30, 2014. Doc. 7 at ¶¶ 17–18. In 2018, the DOI accelerated the Humps' loan and declared the remaining debt immediately due and payable. Doc. 1-2; Doc. 7 at ¶ 19; Doc. 15 at ¶ 19. The amount that the Humps currently owe to the United States is $1,211,782.16.[6] Doc. 1-3; Doc. 7 at ¶ 20. After all other efforts at collection failed, Doc. 7 at ¶ 22, the United States brought this action to foreclose the mortgage, sell the property, and collect any remaining deficiency.

## II. Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." A party opposing a properly made and supported motion for summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for

---

[6] The Humps object that the interest calculation used to arrive at this amount is inaccurate and inadmissible hearsay. Doc. 15 at ¶ 20. The United States attached to its complaint a Certificate of Indebtedness. Doc. 1-3. The Certificate of Indebtedness shows that the Humps currently owe the United States $874,250.00 in principal and $337,532.16 in accrued interest, totaling $1,211,782.16. Doc. 1-3. The Humps do not explain why this interest calculation is inaccurate or provide any evidence of some alternative calculation. Further, the Certificate of Indebtedness is admissible as an exception to the hearsay rule under Federal Rule of Evidence 803(8). United States v. Romero, No. 15 C 5607, 2017 WL 61025, at * 6 (N.D. Ill. Jan. 5, 2017) (holding that certificates of indebtedness fall under the public records exception to the hearsay rule); United States v. Hennigan, No. 6:13-cv-1609-Orl-31DAB, 2015 WL 2084729, at *8 (M.D. Fla. Apr. 30, 2015) (holding that loan analyst's certificate of indebtedness was admissible under the business record exception if properly authenticated at trial, or alternatively, under the public records exception); United States v. Ragan, No. CV 10-7654 (MANx), 2011 WL 5075544, at *2 (C.D. Cal. Oct. 25, 2011) (holding that the certificate of indebtedness was admissible as a public record), rev'd on other grounds, 546 Fed. Appx. 657 (9th Cir. 2013); United States v. Wright, 850 F. Supp. 965, 967 (D. Utah 1993) (same).

trial." Fed. R. Civ. P. 56(e). "To survive summary judgment, a plaintiff must substantiate his allegations with enough probative evidence to support a finding in his favor." Adam v. Stonebridge Life Ins. Co., 612 F.3d 967, 971 (8th Cir. 2010) (quoting Roeben v. BG Excelsior Ltd. P'ship, 545 F.3d 639, 642 (8th Cir. 2008)). In a determination of whether summary judgment is warranted, the evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (quoting Cordry v. Vanderbilt Mortg. & Fin., Inc., 445 F.3d 1106, 1109 (8th Cir. 2006)). "If opposing parties tell two different stories, the court must review the record, determine which facts are material and genuinely disputed, and then view those facts in a light most favorable to the non-moving party, as long as those facts are not so blatantly contradicted by the record that no reasonable jury could believe them." Id. (cleaned up and citation omitted).

### III. Discussion

#### A. Jurisdiction/Tribal Exhaustion Doctrine

At the outset, the Humps challenge whether this Court has jurisdiction over this case and argue that the United States is required to exhaust its remedies in tribal court. Doc. 19 at 1–7. Of significance here is 28 U.S.C. § 1345, which states, "Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress." From this statute, it follows that "district courts have original jurisdiction over suits brought by the United States to foreclose mortgages on realty situated within the district." United States v. American Horse, 352 F. Supp. 2d 984, 987 (D.N.D. 2005) (citation omitted). Included within this category of mortgages are mortgages executed on Indian trust land, where the loan itself is a product of a federal lending program. Id. at 986–990; see also United

States v. Big Crow, CIV 15-5008, 2016 WL 884901, at *2 (D.S.D. Mar. 2, 2016) (finding jurisdiction over foreclosure action commenced by United States against tribal member because "[f]ederal law governs questions involving the rights of the United States arising under nationwide federal programs"); United States v. Crow Eagle, No. CIV 10-3004-RAL, 2010 WL 3942849, at *2 (D.S.D. Oct. 5, 2010) (finding jurisdiction under 28 U.S.C. § 1345 to hear a foreclosure action commenced by United States against a tribal member and the tribe involving a leasehold mortgage).

Further, "The tribal exhaustion doctrine is based on a 'policy of supporting tribal self-government and self-determination . . . and it is prudential, rather than jurisdictional." Gaming World Int'l Ltd. v. White Earth Band of Chippewa Indians, 317 F.3d 840, 849 (8th Cir. 2003) (citations omitted). "Exhaustion is mandatory, however, when a case fits within the policy" of supporting tribal self-government and self-determination. Id. (citation omitted); Burlington N. R.R. Co. v. Crow Creek Tribal Council, 940 F.2d 1239, 1245 (9th Cir. 1991)). Tribal self-government or self-determination is not implicated merely because the United States seeks to foreclose on Indian trust land. United States v. Vanderwalker, No. CIV 10-3008-RAL, 2010 WL 5140476, at *3 (D.S.D. Dec. 10, 2010). This is especially true when the tribe is not involved in the action, id., and "the loan itself was authorized in accordance with a federal lending program," American Horse, 352 F. Supp. 2d at 990 (finding no existing precedent requiring exhaustion in a foreclosure action brought by the federal government against a tribal member).

Here, the United States is commencing a foreclosure action on tribal trust land situated in the District of South Dakota. As such, this Court has jurisdiction to hear the case under 28 U.S.C. § 1345. Moreover, the United States was not required to exhaust its remedies in tribal court because

tribal self-government and self-determination are not implicated in this matter.[7] Rather, this is a dispute between the United States and individuals who have defaulted on a loan guaranteed by the federal government under a federal program. The Cheyenne River Sioux Tribe is not involved in this action in any capacity. In sum, this Court has jurisdiction over this case.

### B. The Debt

This Court now turns to the merits—whether the United States is entitled to summary judgment in this foreclosure action. To recover on a promissory note and foreclose on a mortgage, the United States must establish a prima facie case showing that: (1) the defendant signed a promissory note and executed a mortgage; (2) the government owns the promissory note and mortgage signed by the defendant; and (3) the promissory note has not been repaid or discharged. See United States v. Longo, 464 F.2d 913, 914–15 (8th Cir. 1972) (discussing the district court's findings and holding that summary judgment of foreclosure was properly granted); United States v. Petroff-Kline, 557 F.3d 285, 290 (6th Cir. 2009) (citations omitted); United States v. Lawrence, 276 F.3d 193, 197 (5th Cir. 2001) (citation omitted); United States v. Irby, 517 F.2d 1042, 1043 (5th Cir. 1975) (per curiam). The United States has done so here.

---

[7] The Humps seem to argue that tribal self-government is implicated, and therefore jurisdiction is mandated, because of the purported relationship between 25 U.S.C. § 5135 and the Cheyenne River Sioux Tribal Code of Creditors Rights and Responsibilities. Doc. 19 at 5. Section 5135 of Chapter 25 authorizes the execution of mortgages on Indian trust land. To allow such land to be used as collateral and subject to foreclosure, the statute provides that "[f]or the purpose of any foreclosure or sale proceeding the Indian owners shall be regarded as vested with an unrestricted fee simple title to the land." 25 U.S.C. § 5135(a). In turn, Section 10-2-1 of the Tribal Code authorizes an "action in the Tribal Court to recover any debt and enforce or foreclose any right secured by a mortgage or other security interest on non-trust real or non-trust personal property situated or located on the Reservation." The Humps' contention is that because "Indian owners shall be regarded as vested with an unrestricted fee simple title to the land" for the purpose of any foreclosure and the Tribal Code authorizes foreclosure actions on non-trust land in tribal court, that the action must be brought in tribal court. That is simply not the case. By regarding an Indian owner "as vested with unrestricted fee simple title," 25 U.S.C. § 5135(a) does not thereby delegate jurisdiction to tribal courts.

The United States has presented evidence that the Humps executed and delivered a $1 million promissory note in favor of the United States. Doc. 1-1. The United States also has presented evidence that, as security for the note, the Humps executed and delivered a mortgage in favor of the United States on 1,740.67 acres located in Ziebach County, South Dakota. Doc. 1-4. At the time, all of the land described in the mortgage was real estate held in trust for the benefit of David Hump.[8] Doc. 7 at ¶ 14. The mortgage was approved by the DOI and filed with the appropriate offices. Doc. 1-4; Doc. 7 at ¶ 13; Doc. 15 at ¶ 13. At all times, the United States has been the owner and holder of the promissory note and mortgage. Doc. 8 at ¶ 12. Further, the United States has presented evidence that the Humps defaulted on the loan, their last partial payment on the debt having been December 30, 2014. Doc. 1-2; Doc. 1-3; Doc. 8 at ¶ 14. The promissory note provided for acceleration of the entire indebtedness in the event of default. Doc. 1-1 at 1. In 2018, the DOI sent a letter to the Humps dated October 30, 2018, demanding they pay the full balance of the debt, which was $1,211,782.16 ($874,250 in principal and $337,532.16 in interest). Doc. 1-2. When all other efforts at collection failed, Doc. 7 at ¶ 22; Doc. 8 at ¶ 16, the United States brought this action as required by federal statute and regulation, see 25 U.S.C. § 1492 ("The Secretary shall then take such further collection action as may be warranted . . ."); 25 C.F.R. § 103.38 ("BIA…must pursue collection efforts against the borrower and any co-maker and guarantor, as required by law"). The undisputed material facts justify a grant of summary judgment to the United States.

---

[8] The Humps have since transferred 320 acres of this land to other parties, including the Cheyenne River Sioux Tribe. Doc. 15 at ¶¶ 14, 15; Doc. 18 at 6. As such, the United States does not seek to foreclose on all 1,740.67 acres listed in the mortgage. Doc. 1 at ¶ 2. In its reply brief, the United States clarifies that it does not seek to foreclose on Tract 1882A as it has already been transferred to the Cheyenne River Sioux Tribe. Doc. 18 at 6. As for Tract 5072, the United States seeks to foreclose only on the 80 acres still held in trust for David Hump. Doc. 18 at 6–7.

The Humps have failed to establish a genuine dispute of material fact. The Humps oppose summary judgment, and their primary contention is that their debt on the promissory note was cancelled by the United States. Doc. 19 at 7, 12–17, 20–21. In 2018, the Humps were issued IRS Form 1099-Cs. See Doc. 8-2; Doc. 16-1 at 3–5. IRS Form 1099-Cs are issued when a creditor cancels a taxpayer's debt. Doc. 8-2. In this case, the 1099-Cs cancelled three loans for which the Humps were jointly and severally liable. Altogether, the total amount discharged was $450,642.69.[9] See Doc. 8-2; Doc. 16-1 at 3–5.

Based on these tax documents and a cancellation order issued by the BIA, the Humps mistakenly believed that $901,285.38[10] in debt had been discharged by the BIA. Doc. 19 at 14. This misunderstanding coupled with another mistaken conclusion—that the Humps only owed the DOI $874,250[11]—led the Humps to believe that they were free and clear of all debt owed to the United States. Unfortunately, this is incorrect.

---

[9] The three loans were in the following amounts: (1) $20,784; (2) $141,516.51; and (3) $288,342.18.

[10] The Humps arrived at this figure by doubling the amount of the debt discharged. The Humps were jointly and severally liable on the loans that were issued to them by the Bank and later assigned to the DOI. The Humps were each issued IRS Form 1099-Cs in 2018, but the amount of debt discharged was not $901,285.38. Rather, the amount discharged as to them collectively was $450,642.69. This issuance of the Form 1099-Cs in 2018 of course would not explain why the Humps stopped making loan payments after December of 2014.

[11] The Humps also seem to misunderstand the amount of debt they owed to the DOI. Based on an email sent by Herman Redhouse (Redhouse), Doc. 16-1 at 1, the Humps argue that the principal amount due on the note was only $874,250, Doc. 19 at 10. In the email, Redhouse references two principal amounts, $1 million and $874,250. Doc. 16-1 at 1. He then states, "I used the $874,250 . . ." Doc. 16-1 at 1. The email itself is ambiguous as Redhouse does not articulate his purpose for using the lesser amount. The United States explains that Redhouse used $874,250 as the amount to calculate the Humps' interest payments, an accounting practice that would make sense given the terms of the promissory note. Doc. 18 at 3–4. But regardless of what Redhouse meant in his email, the promissory note is both clear and controlling. The promissory note provides that the principal amount of the debt is $1 million. Doc. 1-1. Further, six percent interest was to be paid per annum on a portion of the principal, that is $874,250. Doc. 1-1. The remaining amount of the principal was to be paid in the form of a balloon payment of $125,750 (without interest accrual) in 2034. Doc. 1-1. Even if this Court assumed that the Humps were correct in their assertion that

Back in 2004, the Bank had issued the Humps three loans, all of which were guaranteed by the DOI. After the Humps filed for Chapter 12 bankruptcy, the Bank submitted a claim of loss to the DOI. The DOI paid the claim, and the Bank assigned all three loans to the DOI. As of September 4, 2007, the total due to the DOI from the Humps on all three loans combined was $1,513,324.45. Doc. 8-1 at 3. However, by settlement and under the Humps' Chapter 12 plan of reorganization, the Humps agreed to pay $1 million, plus six percent interest on a portion of the debt. To carry out this agreement, the three loans were replaced by a new loan, and the Humps executed and delivered the promissory note and mortgage that are at issue in this case. This meant that a substantial part of the debt assigned by the Bank to the DOI was unsecured, and therefore, uncollectible. It is *that* amount that was discharged by the DOI and reflected in the Form 1099-Cs issued to the Humps in 2018. See Doc. 8 at ¶ 13; Doc. 8-1; Doc. 8-2. The cancellation order, in particular, which the Humps rely on heavily, makes this clear. Doc. 8-1. In short, the evidence to which the Humps point does not show that the debt on the promissory note had been cancelled in full. The Humps have failed to demonstrate that there is a genuine dispute of material fact as to the existence of the debt.

The Humps also oppose summary judgment based on their argument that the United States has "a serious conflict of interest." Doc. 19 at 17. The Humps contend that the United States cannot, on one hand, hold land in trust for individual Indians, and on the other, foreclose on that very same land and sell it to a potentially non-Indian buyer. The Humps, however, cite no authority to support this proposition, and federal statutes authorize the United States to foreclose upon Indian

---

the principal amount was $874,250, the Humps have still failed to take into account the interest payments owed on the principal.

land and sell it at a private or public sale. 25 U.S.C. §§ 1492, 1496(e), 5135(a). Therefore, the United States is entitled to collect the debt of $1,211,782.16 through this foreclosure action.

### C. Terms of Foreclosure

Having determined that the United States is entitled to foreclosure, this Court must address the terms of foreclosure. First, the Humps contend that they are entitled to statutory redemption. Doc. 16 at ¶ 16. Although statutory redemption varies by state, the general idea is that the borrower is able to regain the property after foreclosure by paying a certain amount, usually the amount bid on the property at the foreclosure sale. 59A C.J.S. Mortgages § 1371 (2020).

"[F]ederal law . . . governs the rights and liabilities of the parties in cases dealing with the remedies available upon default of a federally held or insured loan." United States v. Victory Highway Vill., Inc., 662 F.2d 488, 497 (8th Cir. 1981) (citations omitted). "Under federal law, no statutory right of redemption after foreclosure exists." Id. at 498 (citation omitted); see also United States v. Vilhauer, 57 Fed. App'x 711, 713 (8th Cir. 2003). The Eighth Circuit has reasoned that the law governing post-foreclosure redemption varies on a state-by-state basis and that federal agencies should not be subject to inconsistent state laws. Victory Highway Vill., Inc., 662 F.2d at 498. Thus, a borrower's only protection in a federal foreclosure action is the common law doctrine of the equitable right of redemption, which applies in every jurisdiction and allows the borrower, after default *but prior to foreclosure*, to perform his entire obligation under the mortgage and have title to his property restored free and clear of the mortgage. Id. Because the loan at issue is a federally guaranteed loan, this Court concludes that the Humps are not entitled to redeem after foreclosure.

The Humps also argue that they are entitled to a homestead exemption. Doc. 16 at ¶ 16. However, the mortgage agreement states, "Said Mortgagors hereby relinquish their rights of

homestead in said premises." Doc. 1-4 at 3. The foreclosure is governed by the terms of the mortgage, and the terms of the mortgage are clear that the Humps are not entitled to a homestead exemption.[12]

Additionally, the Humps dispute the appraised value of the real estate. Doc. 19 at 11. In his affidavit, Mr. Hump states, "[Mr. Martin] states the value of our property is $1,281,000. I disagree with Mr. Martin's valuation of the property." Doc. 16 at ¶ 11. Other than Mr. Hump's opinion, the Humps have not offered any evidence that seriously challenges the valuation of the property. See Rickard v. Swedish Match North America, Inc., 773 F.3d 181, 184 (8th Cir. 2014) (To survive a motion for summary judgment, the nonmoving party "must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." (citation omitted)); Harper v. Wallingford, 877 F.2d 728, 731 (9th Cir. 1989) ("[M]ere disagreement or the bald assertion that a genuine issue of material fact exists no longer precludes the use of summary judgment." (citation omitted)). Thus, there is no *genuine* dispute of material fact as it relates to the value of the property. In sum, the United States is entitled to summary judgment on the entirety of its claim.

**IV.   Conclusion**

For the reasons contained herein and based on Rule 56 of the Federal Rules of Civil Procedure, it is hereby

ORDERED as follows:

1.   Plaintiff's Motion for Summary Judgment, Doc. 6, is granted.

---

[12] Even if the Humps had not explicitly waived their homestead rights, they would have nonetheless impliedly waived their homestead rights because they voluntarily encumbered their homestead property with a secured mortgage. In re Kelley, 7 B.R. 384, 388 (D.S.D. 1980) (holding that debtor waives his right to a claim a homestead exemption superior to that of a secured mortgage when the debtor voluntarily creates an encumbrance on homestead property).

13

2. Under the terms of the mortgage, judgment hereby enters against the Defendants jointly and severally in the amount of $1,211,782.16, plus interest through the date of this judgment and post-judgment interest thereafter under 28 U.S.C. § 1961(a).

3. Plaintiff shall have and recover judgment of foreclosure upon the mortgaged premises set forth in the foreclosure complaint and legally described as:

| TRACT ID | LEGAL DESCRIPTION | ACRES |
|---|---|---|
| X596A | SW ¼, Sec 4, T9N, R18E | 160 |
| X297-A | SE ¼, Sec 5, T9N, R18E | 160 |
| X1727A | S ½ NE ¼, Lot 1, Lot 2, Sec 5, T9N, R18E | 160.22 |
| 1292 | SE ¼, Sec 6, T9N, R18E | 160.0 |
| X1881 | SW ¼ NE ¼, Lot 2, Sec 6, T9N, R18E | 80.12 |
| X1881-A | SE ¼ NE ¼, Lot 1, Sec 6, T9N, R18E | 80.18 |
| X774C | E ½ E ½ SW ¼ NE ¼ (10 acres); E ½ E ½ W ½ E ½ SW ¼ NE ¼ (2.5 acres); and SE ¼ NE ¼ (40 acres); all in Sec 7, T9N, R18E | 52.5 |
| X1367A | E ½ SE ¼, Sec 7, T9N, R18E | 80.0 |
| 5072 | W ½ SE ¼, Sec 7, T9N, R18E | 80.0 |
| 1220 | SW ¼, Sec 8, T9N, R18E | 160.0 |
| X1290-A | NE ¼, Sec 8, T9N, R18E | 160.0 |
| 3697A | SE ¼, Sec 8, T9N, R18E | 160.0 |

4. Judgment against the foregoing interest in real property shall be in the amount of $1,211,782.16, plus interest through the date of this judgment and post-judgment interest thereafter under 28 U.S.C. § 1961(a).

5. A Decree of Foreclosure and Sale shall enter directing the United States Marshal or his deputy to sell the described real estate in any commercially reasonable manner, or at its discretion, to contract with a real estate or brokerage firm or auctioneer in order to maximize the sale of the property, or in any other manner provided by law, and to apply the proceeds as follows: (a) to the costs and expenses of sale; (b) to the payment of the costs and disbursements taxed in the action in which the sale is made; (c) to payment on the debt adjudged by the Court to be due;

(d) to pay the surplus, if any, into court for the use of the person entitled thereto, subject to the order of the Court.

6. The interest of the Defendants in the above-described property shall be foreclosed. Excluding any senior lienholders, the following persons and entities shall be barred and foreclosed of, and from, all rights, title and interest in said property: (a) all Defendants, together with each and every person or entity claiming under them; (b) all persons claiming any lien or encumbrance of any kind or character upon, or against, the real estate, that is subsequent in time or priority, or both, to the lien created by Plaintiff's real estate mortgages; and (c) any and all persons claiming to have acquired any right, title, or interest in, and to the real property.

7. Immediately after this Court issues an Order Confirming Sale, the United States Marshal shall forthwith execute and deliver a Marshal's Deed to the purchaser(s), which shall not be subject to any right of redemption.

8. At the foreclosure sale, Plaintiff is allowed to bid the amount of the judgment debt, but is not required to bid any sum in excess of the judgment debt.

9. To the extent the net proceeds from the sale of the collateral are less than the amount of the debt owed to the United States, Plaintiff is entitled to a deficiency judgment against the Defendants and their business, Bear Coat Bison, jointly and severally, for any sums due which remain unsatisfied after the sale of the mortgaged property.

10. Defendants must cooperate peacefully with the United States Marshal and any persons acting in concert with the Marshal during the sale process and shall peacefully deliver possession of the premises sold.

11. If any party seeks any different or other relief, they should present their request for further relief by motion, with a supporting brief.

12. Plaintiff shall be entitled to costs as taxed by the Clerk of Court.

DATED this 27th day of January, 2021.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE